**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                              )
JOSEPH B. MCCORMACK           )
            Plaintiff,        )
                              )Civil Action No. 10-10461-PBS
        v.                    )
                              )
TOWN OF WHITMAN, SERGEANT DEAN )
LEAVITT; EDWARD R. SLOCUM,    )
CHIEF OF POLICE; and OTHER AS )
YET UNNAMED OFFICERS OF WHITMAN )
POLICE DEPARTMENT,            )
            Defendants.       )
_____)
```

March 20, 2013

Saris, U.S.D.J.

## MEMORANDUM AND ORDER

### I. INTRODUCTION

Plaintiff Joseph B. McCormack brings this action pursuant to 42 U.S.C. § 1983 and Massachusetts state law, claiming that his arrest and detention violated his civil rights. McCormack claims that Whitman Police Officer Dean Leavitt used excessive force to arrest him, lacked probable cause, violated his constitutional right to equal protection of the laws, and denied him necessary medical care in violation of due process.[1] Plaintiff alleges that

_____

[1] Plaintiff brought the following claims against the parties in his First Amended Complaint (Docket No. 3):
    Count I: Section 1983 - Fourteenth Amendment, Equal Protection (Leavitt)
    Count II: Section 1983 - Fourteenth Amendment, Excessive Force and Denial of Medical Care (Leavitt)
    Count III: Section 1983 - Fourth Amendment, Excessive Force

Defendants Town of Whitman and Chief of Police, Edward R. Slocum

failed to properly supervise and train Officer Leavitt.

After a review of the record and hearing, the Court **ALLOWS**

**IN PART and DENIES IN PART** Defendant Dean Leavitt's Motion for

Summary Judgment (Docket No. 52). The Court **ALLOWS IN PART and**

**DENIES IN PART** Defendant Town of Whitman's Motion for Partial

Summary Judgment and **ALLOWS** Defendant Slocum's Motion in its

entirety (Docket No. 55).[2]

---

and False Arrest (Leavitt)
    Count IV: Section 1983 - Eight Amendment, Excessive and
Malicious Force and Denial of Medical Treatment (Leavitt)
    Count V: Section 1983 - Punitive Damages (All)
    Count VI: Intentional Infliction of Emotional Distress
(Leavitt)
    Count VII: Mass. Gen. Laws ch. 258 - Vicarious Liability for
Negligence (Whitman)
    Count VIII: Mass. Declaration of Rights - Excessive Force
and Lack of Probable Cause to Arrest (Leavitt)
    Count IX: False Arrest and Imprisonment (All)
    Count X: Battery (All)
    Count XI: Section 1983 - Failure to Train, Supervise and
Discipline (Slocum)
    Count XII: Section 1983 - Failure to Act (Slocum)
    Count XIII: Section 1983 - Failure to Train, Supervise and
Discipline (Whitman)
    Count XIV: Mass. Gen. Laws ch. 258 - Negligence (Whitman)
    Count XV: Mass. Gen. Laws ch. 258 - Vicarious Liability
(Whitman)

    [2] After hearing, Plaintiff filed a limited stipulation of
dismissal as to selected counts of the first amended complaint.
(Docket No. 92). As to Defendants Town of Whitman and Edward R.
Slocum, he dismissed counts one, five, six, nine and ten. As to
Defendant Leavitt, he dismissed count five.

## II. UNDISPUTED FACTS

When all reasonable inferences are drawn in Plaintiff's favor, the record contains the following facts, which are undisputed except where noted.

**A. The Incident**

Plaintiff Joseph B. McCormack was a seventeen-year-old high school student who resided in the Town of Whitman, which is near Brockton, Massachusetts. He is a person of color. Defendant Officer Dean Leavitt was a Sergeant in the Whitman Police Department. Defendant Edward R. Slocum served as the acting Chief of Police from July 2006 until September 2007. As acting Chief and head of the Department, Slocum was Leavitt's supervisor.

On March 17, 2007 Plaintiff consumed several beers a St. Patrick's Day party located in Whitman. It turned out not to be a lucky night. Late in the evening, McCormack left the party with three friends: Jay Brazer, Ben Ford, and Matt Newton. While walking to Brazer's car, some or all of the teenagers began playfully throwing snowballs at each other. Eventually, they began to throw snowballs at surrounding houses as well. A resident of one of these houses, David Jones, came out of his home and confronted the young men. The situation quickly snowballed. Brazer threw a snowball at Jones, and at some point during the confrontation, Jones approached the group and Brazer pushed Jones to the ground.

The group fled to Brazer's car in a nearby parking lot.
Rather than return home, Brazer drove the group back to Jones'
home, exited the car, and threw a snowball at the house. Jones
ran out of his home once more to confront the young men. Brazer
started the car, attempting to flee the scene. As the boys were
driving off, Jones chased down the car and began grabbing and
hitting Brazer through the car's partially open window. Jones
clung to the window, and as the vehicle accelerated, Jones fell
to the ground. The group of teenagers drove away in the vehicle.

Officer Leavitt was on duty beginning at midnight March 18,
2007. He received a dispatch that a resident of Whitman was
complaining about "people throwing objects at this house."
Leavitt and two other officers responded to the call at
approximately 12:10 AM and spoke to Jones about the incident.
Jones reported that a number of young men had come down his
street throwing snow and ice at his house. Jones also told the
officers that the young men had verbally accosted him and
threatened bodily harm. After an unsuccessful search for the
young men, Officer Leavitt told Jones to call the police again if
another disturbance occurred, and then he left.

After fleeing from their second confrontation with Jones,
Brazer decided to turn the car around and return to Jones' home
to fight him. Brazer parked the car on a nearby side street.
Brazer, Newton, and McCormack walked towards Jones' home on Broad
Street for a third time. Jones and the three boys began yelling

4

at each other back and forth. Jones told the boys that he was going to "kick [their] ass" and they responded they were going to "kick his ass." Brazer turned around and began to leave the scene, while Newton and McCormack lingered, exchanging heated words with Jones.

Shortly after this third encounter began, the boys heard police sirens and saw the flashing blue lights of the police cars approaching. The boys turned from Jones and fled down the street. Officer Leavitt, who had received a call to return to Jones' home, approached the scene, driving in his police cruiser. He arrived within 30 seconds of receiving the dispatch and saw Jones chasing after the teenagers down the street. Leavitt slowed the vehicle to speak with Jones through the car window. Jones was breathing heavily, and he pointed down the street in the direction that Plaintiff and Newton were heading, stating, "They did it again. There they are, that's them." Leavitt saw two boys, McCormack and Newton, running down the street ahead of him and accelerated his vehicle up to 30 mph in order to apprehend them. As Leavitt approached the boys in his vehicle, Newton turned abruptly to the right, jumped a snow bank, and ran off between the houses.

Leavitt continued to pursue McCormack and attempted to "head off" McCormack with his vehicle by pulling the police cruiser slightly ahead of McCormack, turning the vehicle in front of him and stopping. Leavitt stated at deposition that he wanted to "get

5

in front of [McCormack], stop the car so it would block his path"
and prevent him from evading arrest. Leavitt had performed this
maneuver before on other occasions, though in less confined
spaces. Plaintiff contends Leavitt intentionally hit him.

It is contested whether Officer Leavitt intentionally or
accidentally hit McCormack with his car or whether McCormack ran
into the police cruiser. Leavitt states that he was maintaining a
straight line with the vehicle parallel to McCormack. He knew
that the front of the car was not yet past McCormack's body. He
stated he was about to swerve or was in the process of swerving,
when McCormack ran into his cruiser and fell down. At this point
Leavitt stopped the car approximately ten feet in front of where
Plaintiff fell. McCormack claims that the police cruiser did
swerve in front of him and the bumper hit the back of his leg,
causing him to fall to the ground, whereupon the tire of the car
rode over his calf. Both parties agree that Plaintiff's body came
into contact with Officer Leavitt's police cruiser.

Once the police cruiser stopped, Leavitt exited the car and
ran towards McCormack in order to prevent him from escaping. As
Leavitt approached Plaintiff, McCormack asked him "Why did you
hit me?" to which Leavitt responded "I didn't hit you. You ran
into the car." As Plaintiff was pushing off the ground, Leavitt
grabbed him, put him against the cruiser, and placed him in
handcuffs. Plaintiff claims that as Leavitt was arresting him,
Leavitt repeatedly referred to him as "boy" and "pretty boy."

Plaintiff also claims, and Leavitt denies, that Leavitt asked
Plaintiff such questions as whether he was from Brockton and
whether he was a drug dealer. Plaintiff stated that Leavitt's
comments and questions made him feel like "[Leavitt] was putting
[him] down because of [his] race." As Leavitt was questioning
him, Plaintiff asserts that Leavitt also yanked on his earrings
until his ears began to bleed. Leavitt noted in a later police
report that at the time of arrest, Plaintiff's breath smelled of
alcohol.

Throughout the course of the arrest, Plaintiff claims and
Defendant Leavitt denies, that he notified Leavitt that he was in
pain, saying several times "you just ran over me," "my ankle's
killing me," "I'm hurt," and "I need help." Plaintiff recalls
that his ankle was bleeding and that he could not put weight on
the ankle. Leavitt, in contrast, claims that he asked Plaintiff
at the scene and later at the police station if he was okay, and
Plaintiff responded, "Yeah, I'm okay," and indicated that he was
not injured. Leavitt stated he did not believe that Plaintiff was
injured at the time. Leavitt placed Plaintiff in the police
cruiser and transported him to the police station. Plaintiff was
processed, placed in a holding cell, and was held at the police
station for approximately two and a half hours. At no time was he
provided any medical treatment or inspected for injuries. He was
charged with disturbing the peace and threatening to commit
assault and battery. Later that week, Plaintiff was arraigned and

sentenced to a six-month probationary period and 20 hours of community service, after which the charges were dropped.

Plaintiff's father, Michael McCormack, picked Plaintiff up at the police station. At the police station, Michael McCormack observed that his son was limping, he had footprints on his shirt, and had dried blood around his ears. Later, when looking at Plaintiff's leg, Michael McCormack noticed that it was swollen and saw four or five marks that looked like tread marks going up the back of Plaintiff's leg. Plaintiff told his father about the incident with the police cruiser, and his father brought him to the doctor the next morning and then to the hospital for an X-ray. At the time Plaintiff's leg was too swollen for a proper diagnosis, but he was eventually diagnosed with strained ligaments.

Plaintiff asserts that in February of 2008, he was admitted to the hospital for chest pains and anxiety due to trauma from the event. He also claims that he experienced long term physical effects from accident, including stiffness and pain in his left leg. In January 2009, Plaintiff began receiving physical therapy for his leg, two to three times a week for five weeks. Since then he has not received physical therapy, but Plaintiff asserts he has ongoing pain in his left leg as a result of the accident.

## B. Officer Leavitt's Background

Officer Leavitt became a police officer in 1983 and joined

8

the Whitman Police Department in 1986. Prior to the events of
March 18, 2007, Officer Leavitt had never been disciplined for
any civil rights complaints.

    During his tenure with the Department, Leavitt was
restricted to desk duty on two separate occasions. He was
restricted from operating vehicles for four years between 1988
and 1992. The reason for the restriction was not documented, but
Leavitt stated in deposition he thought the Chief of Police at
the time "wasn't happy with [his] driving." Leavitt believed this
dissatisfaction began after the Chief witnessed Leavitt drive
through a four-way stop sign. Leavitt was responding to a call
with his sirens on, when the Chief was waiting at the same
intersection in a car with his family. Leavitt was again
restricted to desk duty for a year from 2002 to 2003 because of
an allegation that he had damaged the police cruiser's internal
computer. Officer Leavitt also missed two years of work from 2004
to 2006 as a result of injuries incurred in a motor vehicle
accident while on the job. There is no indication that Officer
Leavitt was at fault for the collision. However, he did undergo
psychological treatment for post-traumatic stress disorder after
the accident. As part of his initial police academy training,
Officer Leavitt received training in the use of a motor vehicle.
However subsequent to his desk restrictions and motor vehicle
accident, Officer Leavitt never again received additional
training on proper use of a police motor vehicle or vehicular

pursuit.  Officer Leavitt did receive intermittent training on
the use of deadly force. However, these trainings only appeared
to deal with hands-on deadly force, such as use of a gun or
baton, not vehicular deadly force or vehicular pursuit.

Officer Leavitt was also disciplined by the Department
because of problematic interactions with juveniles. In 2001, the
Department received complaints about Leavitt's arrest of juvenile
skateboarders who were weaving in and out of traffic. As a result
of these complaints, the Chief of Police ordered that Leavitt not
be involved in matters dealing with juveniles.[3] Officer Leavitt
did receive training on how to interact with juveniles at his
initial police academy, as well as intermittently throughout his
career.

Finally, Leavitt was disciplined for other unprofessional
interactions at a public skating rink, including making rude
comments to patrons, acting inappropriately towards a female
staff member, and blowing cigar smoke in a patron's face.

## C. Chief of Police Slocum

Edward R. Slocum was appointed interim chief of police in
the summer of 2006 and continued in that position until September

---

[3] In 1992, the Department received two complaints alleging
that Leavitt used excessive force when he arrested a female youth
while breaking up a house party. Leavitt was never disciplined
for this matter. This incident is discussed in Officer Leavitt's
sealed personnel file. Leavitt said he did not recall the
incident at deposition (Leavitt Depo. 87) and none of the
attorneys reference it in the legal documents.

of 2007. He was not directly involved with the events of March 17-18, 2007.

The evening of March 18, 2007, Officer Leavitt wrote a police report which did not include any description of the Plaintiff's contact with the police cruiser because he "did not believe there was a motor vehicle accident per se involved with the whole incident." Subsequent to the events of March 17-18, 2007, Michael McCormack and Plaintiff complained to Slocum about Leavitt's conduct. In response, Slocum began an investigation. He scheduled a meeting with Officer Leavitt on March 23rd to discuss the incident and after the meeting requested that Officer Leavitt submit an accident report documenting the contact between Plaintiff and the police cruiser. Slocum also requested reports from other officers on the scene. On March 26, Frank Lynam, the Town Administrator, scheduled a meeting with Chief Slocum and the McCormack family to discuss the incident. On March 27, Chief Slocum ordered Leavitt to submit a supplemental report to include more details regarding the events of March 18th. After investigation Chief Slocum concluded that Officer Leavitt failed to follow proper procedure when he 1) did not file an accident report after the collision between Plaintiff and the cruiser and 2)did not examine Plaintiff for injuries. Accordingly, Officer Leavitt was suspended for five days without pay. Leavitt was not disciplined for improper use of a motor vehicle.

Prior to the underlying incident, Chief Slocum reviewed

Officer Leavitt's personnel file in part, though not thoroughly. Before March 17, Chief Slocum was aware that Leavitt had been restricted from driving a motor vehicle for a four year time period, although he did not know the circumstances surrounding the restriction. He was also aware that Officer Leavitt had recently returned from a two year leave after a motor vehicle accident. Prior to March 17, Chief Slocum did not have knowledge of Officer Leavitt's restriction from working with juveniles, his treatment for PTSD due to his motor vehicle accident, or the disciplinary action related to professionalism complaints made by the skating rink. There is no evidence that Slocum knew about Leavitt's one-year driving restriction in 2002.

**D. Town of Whitman Policies**

At the time of the underlying incident, the Town of Whitman had a policy outlining proper protocols during vehicular pursuit. Whitman Police Department's Vehicular Pursuit Policy allows "heading off" "only when there is a determination that the pursued [suspect] must be immediately stopped because [the suspect] . . . pose[s] a clear and immediate threat of death or serious physical injury to the public." Vehicular Pursuit: Policy & Procedure No. 1.04 at 10 (Whitman Police Department 2008). Whitman Police Rules and Regulations states that "[t]actics employed to stop pursued suspects such as . . . heading off . . . are extremely hazardous and should only be considered as a last

resort, in those rare instances when warranted to save a life."[4]
Whitman Police Rules and Regulations at 53 (Whitman Police
Department 2000).  Both of these policies are written for
situations where a police vehicle is pursuing another motor
vehicle. Additionally, the Use of Force Policy defines "deadly
force" as "any use of force that is reasonably intended or likely
to cause death or great bodily injury," although there is no
specific mention of "heading off." Use of Force: Policy &
Procedure No. 1.01 at 2 (Whitman Police Department 2005). The Use
of Force Policy generally notes that, "[o]fficers use only the
force that is reasonably necessary to make a lawful arrest, to
place a person in protective custody, to effectively bring an
incident under control, or to protect the lives or safety of the
officer and others." Id.

The Town of Whitman also had regulations regarding the
physical welfare of arrested persons which provided, in part, as
follows:

> Officer in Charge and/or Shift Commander: Be responsible
> for the care and handling of prisoners in accordance with
> departmental policies and procedures and state law.
> Responsibilities include, but not necessarily limited to
> the following guidelines:
>
>     a. Examine each prisoner at the Police Station for
>     injuries. If there are any found, record the fact

---

[4] Plaintiff asserts that the "heading off" tactic is defined
as "deadly force." The policy specifies that the pursuit tactic
"vehicle contact" is only authorized in "conformance with
department policy on the Use of Deadly Force." Vehicular Pursuit
Policy at 11.

> in writing and submit the report to the Chief of Police. (G.L. c. 276, s. 33) Determine whether any of the injuries were inflicted by a member of the Department. If they were, note such in the report.
>
> b. Investigate the circumstances of the incident for possible disciplinary action and require the officer who inflicted the injury to submit a detailed report describing the incident. Forward such report to the Chief.

<u>Whitman Police Rules and Regulations</u> at 35-36. At the time of the incident, Officer Leavitt was the Officer in Charge.

### III. DISCUSSION

**A. Standard of Review**

Summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"   <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  To succeed on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." <u>Rogers v. Fair</u>, 902 F.2d 140, 143 (1st Cir. 1990).

Once the moving party has made such a showing, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." <u>Barbour</u>, 63 F.3d at 37 (internal quotations omitted).  The non-

14

moving party must establish that there is "sufficient evidence favoring [its position] for a jury to return a verdict [in its favor].  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).  The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  Barbour, 63 F.3d at 36 (citation omitted).

## B. § 1983 Constitutional Claims

Section 1983 provides a claim for vindicating substantive rights conferred by the Constitution or laws of the United States that have been violated by persons acting under color of state law. See Graham v. Connor, 490 U.S. 386, 393-94 (1989). Thus, "[i]n order to make out a viable claim under § 1983, a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued." Mead v. Independence Ass'n, 684 F.3d 226, 231 (1st Cir. 2012) (internal quotations omitted). "Section 1983 does not require any intent to violate constitutional rights." Hudson v. New York City, 271 F.3d 62, 68 (2d. Cir. 2001). However, "all Fourth Amendment violations require intentional actions by officers rather than 'the accidental effects of otherwise lawful government conduct.'" Id. at 69 (quoting Brower v. Count of Inyo,

489 U.S. 593, 596 (1989). The Defendants do not dispute that the alleged conduct transpired under color of state law.

Additionally, the doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The First Circuit has adopted the two-part test articulated by the Supreme Court in Pearson v. Callahan, 555 U.S. 223 (2009). See Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). Under Pearson and Maldonado, the relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. Id.

For purposes of the second step of that analysis, whether the right in question was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." Mlodzinski v. Lewis, 648 F.3d 24, 32-33 (1st Cir. 2011). "This prong of the inquiry, while requiring a legal

determination, is highly fact specific, and may not be resolved on a motion for summary judgment when material facts are substantially in dispute." <u>Swain v. Spinney</u>, 117 F.3d 1, 9 (1st Cir. 1997). <u>See also</u> <u>St. Hilaire v. City of Laconia</u>, 71 F.3d 20, 24 n. 1 (1st Cir. 1995) ("The ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is a question of law, subject to resolution by the judge not the jury. But if there is a factual dispute, that factual dispute must be resolved by a fact finder.") (internal citations omitted).

**1. Defendant Dean Leavitt**

**a. False Arrest**

Plaintiff claims that Officer Leavitt placed him under arrest without probable cause in violation of his Fourth Amendment rights. "Probable cause exists when the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that [suspect] had committed or was committing an offense." <u>United States v. Pardue</u>, 385 F.3d 101, 107 (1st Cir. 2004) (internal quotations omitted).

Here, Officer Leavitt received several phone calls from a resident stating that four youths were throwing objects at his home and verbally threatening him. When Leavitt arrived at Jones'

house, he saw the victim chasing the boys down the street,
breathing heavily, and pointing to the Plaintiff fleeing the
scene. Jones stated that the fleeing Plaintiff was the
perpetrator of the disturbance. Leavitt had probable cause to
believe based on the totality of the circumstances that Plaintiff
had committed the crime of disturbing the peace. Summary judgment
on the Fourth Amendment false arrest claim (count 3) is **ALLOWED.**

**b. Excessive Force**

Plaintiff next claims that Defendant Officer Leavitt used
excessive force in the course of his arrest in violation of his
Fourth Amendment (count 3), Eighth Amendment (count 4), and
Fourteenth Amendment rights (count 2). He alleges that Officer
Leavitt ran over his leg with his police cruiser while attempting
to head him off with the vehicle. He also states that, once
arrested, Leavitt grabbed him by the earrings, pulling and
hitting them until his ears bled. Leavitt argues that the police
cruiser's contact with Plaintiff was accidental, and so, cannot
constitute an intentional seizure necessary for an excessive
force claim. In the alternative, he argues qualified immunity.

In order to establish a Fourth Amendment claim[5] based on

---

[5] Excessive force claims arising out of arrests are analyzed
under the Fourth Amendment's protection against unreasonable
seizures, not the Eighth Amendment. Bastien v. Goddard, 279 F.3d
10, 14 (1st Cir. 2002). See also Graham v. Connor, 490 U.S. 386,
394-95 (1989). Thus, all actions leading up to and including
arrest are analyzed under the Fourth Amendment, and summary
judgment is **ALLOWED** as to the Eighth Amendment excessive force

alleged excessive use of force, Plaintiff must show (1) that there was a "seizure" within the meaning of the Fourth Amendment; and that (2) the use of force during the seizure was unreasonable under the circumstances. Graham v. Connor, 490 U.S. 386, 394-95 (1989); Bastien v. Goddard, 279 F.3d 10, 14 (1st Cir. 2002). Seizure under the Fourth Amendment "requires an intentional acquisition of physical control." Brower v. County of Inyo, 489 U.S. 593, 596 (1989). A collision between a police cruiser and a suspect constitutes a seizure only when plaintiff submits evidence from which a reasonable factfinder could conclude that collision was an intended means to prevent flight, rather than an accidental consequence of pursuit. See, e.g., Campbell v. White, 916 F.2d 421, 423 (7th Cir. 1990) (where the collision between officer and plaintiff was not "the means intentionally applied to effect the stop, but was rather an unfortunate and regrettable accident.") (internal quotations omitted).

There is a dispute of fact as to whether Officer Leavitt intentionally swerved into Plaintiff in order to prevent him from running or whether the collision was accidental. Leavitt asserts he was not intending to collide with Plaintiff, but only intending to head him off. However, a jury could find that he intentionally struck McCormack. See Clark v. Thomas, 505 F. Supp. 2d 884, 895-96 (D. Kan. 2007) (rejecting summary judgment on

claims in count 4.

excessive force where evidence suggested that officer intended to strike plaintiff with cruiser); <u>Ferguson v. Pennsylvania</u>, No. 05-280E, 2009 U.S. Dist. LEXIS 20099, at *9-11 (W.D. Pa. Mar. 12, 2009)(summary judgment denied because genuine issue of material fact exists as to whether officer intentionally struck plaintiff with police cruiser). Additionally, it is undisputed that Leavitt was attempting to use his police cruiser to "head off" McCormack in order to prevent him from evading arrest. Therefore, Leavitt intentionally used his police cruiser as a means to effectuate a stop. The fact that his chosen method of seizure caused more harm than intended does not mean the seizure was accidental. <u>Cf. Landol-Rivera v. Cruz Cosme</u>, 906 F.2d 791, 796 (1st Cir. 1990) ("A further instance of unintentional conduct triggering Fourth Amendment liability may occur when a police officer accidentally causes more severe harm than intended to an individual, such as when a suspect is injured 'by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg.'") (quoting <u>Brower</u> 489 U.S. at 598-99).

As discussed above, Officer Leavitt had sufficient probable cause to justify the arrest of Plaintiff, and the right to make an arrest carries with it the right to use some degree of force. <u>See</u> <u>Graham</u>, 490 U.S. at 396. Only excessive force is actionable. <u>Gaudreault v. Municipality of Salem</u>, 923 F.2d 203, 205 (1st Cir. 1990) ("[N]ot every push or shove rises to the level of a

constitutional violation."). Claims of excessive force are judged
by an objective reasonableness standard. <u>Graham</u>, 490 U.S. at 397.
"This determination requires us to balance the individual's
interest against the government's, weighing three non-exclusive
factors: (1) 'the severity of the crime at issue,' (2) 'whether
the suspect poses an immediate threat to the safety of the
officers or others,' and (3) 'whether [the suspect] is actively
resisting arrest or attempting to evade arrest by flight.'"
<u>Raiche v. Pietroski</u>, 623 F.3d 30, 36 (1st Cir. 2010) (quoting
<u>Graham</u>, 490 U.S. at 396). The reasonableness test must examine
"the facts and circumstances of each particular case," and must
allow "for the fact that police officers are often forced to make
split-second judgments -- in circumstances that are tense,
uncertain, and rapidly evolving -- about the amount of force that
is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 396-
97.

        When the facts are viewed in the light most favorable to the
Plaintiff, a jury could find that the use of force was not
reasonable. First, the crime was not severe. Leavitt was pursuing
teenagers who had been accused of throwing snowballs at houses
and making verbal threats. McCormack and Brazer were eventually
charged with disturbing of the peace and required to complete 20
hours of community service. <u>See, e.g.</u>, <u>Grawey v. Drury</u>, 567 F.3d
302, 311 (6th Cir. 2009) (analyzing <u>Graham</u> factors and finding
that "[plaintiff]'s crime, disturbing the peace, was relatively

minor."); <u>Pliakos v. City of Manchester</u>, No. 01-461-M, 2003 U.S.
Dist. LEXIS 12589, at *32 (D.N.H. July 15, 2003) (characterizing
disturbing of the peace in excessive force analysis as
"relatively minor criminal mischief"). Although the teenagers
also made verbal threats to Jones, there was no evidence that
Jones had been physically injured. Nor was there any reason to
suspect that Plaintiff was armed or would cause immediate harm to
Officer Leavitt or others in the community. While Plaintiff was
fleeing the scene, a reasonable jury could find that flight alone
is not sufficient to justify the force utilized in this instance,
which was substantial. <u>See, e.g.</u>, <u>Ludwig v. Anderson</u>, 54 F.3d 465
(8th Cir. 1995) (holding an attempt to hit an individual on foot
with a moving squad car "is an attempt to apprehend by use of
deadly force"). The Department's own <u>Rules and Regulations</u>
recognize that "heading off" or "driving alongside" a pursued
suspect in a motor vehicle is "extremely hazardous and should
only be considered as a last resort." <u>See</u> <u>Raiche</u>, 623 F.3d at 37
(considering Police Department policies to determine whether
level of force was reasonable).

Given the relatively minor crimes alleged, a reasonable jury
could find that use of a police cruiser to strike or "head off"
Plaintiff was excessive. <u>See</u> <u>Blanchard v. Swaine</u>, No.
08-40073-FDS, 2010 U.S. Dist. LEXIS 125397, at *22-24 (D. Mass.
Nov. 29, 2010) (holding a reasonable jury could find that use of
a police cruiser to stop pursuit of unarmed plaintiff accused of

shoplifting was unreasonable); <u>Bellmon v. City of Phila.</u>, No. 11-CV-1966, 2012 U.S. Dist. LEXIS 129909, at *18-19 (E.D. Pa. Sept. 10, 2012) (denying summary judgment because a reasonable juror could conclude that the officers used excessive force in effecting the plaintiff's arrest by striking him intentionally with the patrol car); <u>Hartman v. County of Nassau</u>, No. 04 CV 1784 (CLP), 2008 U.S. Dist. LEXIS 34729, at *33 (E.D.N.Y. Apr. 28, 2008) (denying summary judgment on excessive force because dispute of fact as to whether intentionally striking plaintiff with cruiser was reasonable).

With respect to the qualified immunity defense, a reasonable officer should have known that intentionally driving a car into or in front of a fleeing teenager accused of throwing snowballs and making verbal threats violated McCormack's clearly established Fourth Amendment rights. Summary judgment is **DENIED.**

Finally, Plaintiff alleges that Leavitt used excessive force when he pulled on his earrings until they bled. According to the Plaintiff's testimony, Leavitt did not pull on Plaintiff's earrings until after he was arrested and in handcuffs. Case law is not clear on "whether the Fourth Amendment continues to [protect individuals against excessive force] beyond the point at which arrest ends and pretrial detention begins." Graham, 490 U.S. at 395 n.10. <u>See also</u> <u>Harriman v. Hancock County</u>, No. 08-122-B-W, 2009 U.S. Dist. LEXIS 53129, at *50-56 n.18 (D. Me.

Mar. 31, 2009) (discussing unclear state of law and collecting cases). However, at the very least, Plaintiff retained substantive due process rights under the Fourteenth Amendment. Cf. Cummings v. McIntire, 271 F.3d 341, 344 (1st Cir. 2001) ("Claims of excessive force by a police officer arising outside the context of a seizure, and thus outside the Fourth Amendment, are analyzed under substantive due process principles."). As the parties have not briefed the issue under the Fourteenth Amendment legal standard, summary judgment is **DENIED** as to the excessive force claims in count 2.

### c. Denial of Medical Treatment

McCormack also claims that Leavitt denied him medical treatment in violation of the Eighth and Fourteenth Amendments. He argues that Leavitt knew McCormack was injured and that his medical injuries were sufficiently serious. Defendant counters that Plaintiff did not suffer a serious medical ailment requiring medical treatment. Because McCormack was a pretrial detainee rather than a convicted prisoner, the Fourteenth Amendment governs his claim.[6] Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007). Summary judgment for denial of medical treatment under the Eighth Amendment (count four) is **ALLOWED.**

---

[6] McCormack's precise status does not make a practical difference in this court's analysis, however, because generally the standard applied under the Eighth and Fourteenth Amendment is the same. See Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007).

To prove a Fourteenth Amendment violation, Plaintiff must prove: (1) that there was an objectively serious medical need; and (2) that Leavitt exhibited deliberate indifference to this medical need. <u>Brace v. Massachusetts</u>, 673 F. Supp. 2d 36, 40 (D. Mass. 2009) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). A serious medical need is one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Mahan v. Plymouth Cnty. House of Corr.</u>, 64 F.3d 14, 18 (1st Cir. 1995).

A showing of deliberate indifference, in this context, requires more than mere inadvertence or negligence. <u>DesRosiers v. Moran</u>, 949 F.2d 15, 19 (1st Cir. 1991) (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)). Rather, a plaintiff must establish that the officer was aware of a substantial risk of serious harm which he intentionally disregarded. <u>Brace</u>, 673 F. Supp. 2d at 41. In other words, Plaintiff must prove that the Defendant had a "culpable state of mind and intended wantonly to inflict pain." <u>DesRosiers</u>, 949 F.2d at 19. <u>See also</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain."(internal quotations omitted)).

There remains a dispute of fact as to whether Plaintiff's injury was objectively serious. Defendant contends that Plaintiff's medical needs were not serious because he suffered no

25

long term injury, and at the time of the accident he was able to walk about unaided. Plaintiff contends he suffered strained ligaments immediately after the incident with the police cruiser. He also claims the he suffers from long term leg pain and has received physical therapy as a result of the accident. At the time of the accident, Plaintiff alleges his ankle was bleeding, he had tire treads on his leg, he was limping, and his leg was observed swollen by hospital staff.

If the medical need was sufficiently serious, a reasonable jury might find that Officer Leavitt acted with deliberate indifference. Although Leavitt states that he did not realize that Plaintiff was injured, Plaintiff alleges that he repeatedly notified Officer Leavitt of the harm he had suffered, that he was in pain and asked for help. Given these repeated statements, a reasonable jury could find that Defendant Leavitt knew Plaintiff required medical attention and ignored his requests. If proven, such conduct would be a clear violation of Plaintiff's constitutional rights for purposes of qualified immunity. Summary judgment is **DENIED.**

## d. Equal Protection Claim

Plaintiff alleges that Defendant Officer Leavitt denied him equal protection of the laws in violation of the Fourteenth Amendment. Specifically, he claims that Leavitt's numerous references to Plaintiff as "boy" and "pretty boy" as well as

repeatedly asking Plaintiff whether he was "from Brockton" or a drug dealer demonstrated racial animus towards Plaintiff. Defendant argues that there is no evidence Plaintiff was singled out from other similarly situated individuals.

"To prevail on a claim of racial discrimination in violation of the Equal Protection Clause, a plaintiff must establish (1) that he was selected for adverse treatment compared with others similarly situated, and (2) that the selection for adverse treatment was based on his race." Ríos-Colón v. Toledo-Dávila, 641 F.3d 1, 4 (1st Cir. 2011). "Some evidence of actual disparate treatment is a threshold requirement of a valid equal protection claim." Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 32 (1st Cir. 2012) (internal quotation omitted).

Several circuit courts have held that the use of racial epithets alone does not constitute an equal protection violation. DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000) ("The use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution. Standing alone, simple verbal harassment does not . . . deny a prisoner equal protection of the laws.") (internal citations omitted); Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999) ("We hold today that an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation."); Carter v. Morris, 164 F.3d 215, 219 n.3 (4th Cir. 1999)("[A]lthough

[plaintiff] alleges that individual officers insulted her with racial epithets, such undeniably deplorable and unprofessional behavior does not by itself rise to the level of a constitutional violation.") However, these decisions imply that if racial epithets are accompanied by other forms of harassment, this may constitute an equal protection violation. Indeed "the use of racially derogatory language . . . can be quite important evidence of a constitutional violation." DeWalt v. Carter, 224 F.3d at 612 n.3.

In this case, a reasonable jury could find that Officer Leavitt's allegedly repeated use of the terms "boy" and "pretty boy," in conjunction with his numerous allegations that McCormack was from Brockton and a drug dealer, demonstrated racial animus. See King v. City of Eastpointe, 86 Fed. Appx. 790, 803 (6th Cir. Mich. 2003) ("The word 'boy' . . . could definitely be interpreted as racially derogatory."). Although Leavitt denies these statements, if found by a jury, these potentially derogatory taunts coupled with a finding of excessive force or denial of medical treatment could demonstrate an equal protection violation. See Alexis v. McDonald's Restaurants, 67 F.3d 341, 354 (1st Cir. 1995) (holding a rational factfinder could find Equal Protection violation based on evidence of racial animus and excessive force); Kargbo v. O'Mara, No. 11-cv-162-LM, 2011 U.S. Dist. LEXIS 152014, at *16-17 (D.N.H. Dec. 22, 2011) (finding racially derogatory terms used in the context of using excessive

force was sufficient to state a plausible claim that Plaintiff
was treated worse than others similarly-situated because of his
race). If Leavitt's use of excessive force and denial of medical
treatment was racially motivated, this is a clear violation of
the Fourteenth Amendment. Accordingly, summary judgment on the
equal protection claim (count one) is **DENIED**.

**2. Defendant Town of Whitman**

Plaintiff brings a claim of vicariously liability against
the Town of Whitman for failure to train, supervise or discipline
Officer Leavitt, which led to Plaintiff's injuries implicating
the Fourth, Eighth, and Fourteenth Amendments. Municipalities are
not vicariously liable under § 1983 for the actions of their
non-policymaking employees. <u>See</u> <u>Bd. of the Cnty. Comm'rs v.</u>
<u>Brown</u>, 520 U.S. 397, 403-04 (1997). A city may only be held
liable under § 1983 for its own unconstitutional action. <u>See</u>
<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978).  Thus,
under § 1983, a municipal government will only be held liable
when the "execution of [the municipal] government's policy or
custom . . . inflicts the injury." <u>Id.</u> at 694.

A city's policy of inadequately training its police force
can serve as a basis for § 1983 liability if the city's failure
to train "amounts to deliberate indifference to the rights of
persons with whom the police come into contact." <u>City of Canton</u>
<u>v. Harris</u>, 489 U.S. 378, 388 (1989). In this context, deliberate

indifference will be found where the municipality fails to provide adequate training notwithstanding an obvious likelihood that inadequate training will result in the violation of constitutional rights. Id. at 390. See also Haley v. City of Boston, 657 F.3d 39, 52 (1st Cir. 2011) ("Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies.").

The plaintiff must also prove that "the deficiency in training actually caused the police officers' indifference" to the public's constitutional rights. Id. at 391. See also Brown, 520 U.S. at 404 ("The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."). A generalized showing of a deficient training program is not sufficient. The plaintiff must establish that the particular officer who committed the violation had been deprived of adequate training, and that this specific failure in training was at least a partial cause of the ultimate injury. See Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v.

Thompson, 131 S. Ct. 1350, 1360 (2011) (quoting Brown, 520 U.S. at 409).  Fault is established "[w]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." Id.  However, the Supreme Court has noted that "in a narrow range of circumstances . . . the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." Connick, 131 S. Ct. at 1361 (internal quotations omitted). See also Canton, 489 U.S. at 390 ("[I]t may happen that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").

Courts analyzing single-incident liability generally look to the frequency with which public officers engage in a particular conduct, Connick, 131 S. Ct. at 1360, and the predictability that an officer lacking training to handle this situation will violate citizens' rights, Brown, 520 U.S. at 409. For example, the Court in Canton noted that a city generally arms its police force with firearms and deploys those armed officers into the public with the purpose of pursuing criminals. Canton, 489 U.S. at 390 n. 10. Therefore, "[g]iven the known frequency with which police attempt

31

to arrest fleeing felons and the 'predictability that an officer
lacking specific tools to handle that situation will violate
citizens' rights,'" a failure to train officers on the
constitutional limits on the use of deadly force would amount to
deliberate indifference. Connick, 131 S. Ct. at 1361 (quoting
Brown, 520 U.S. at 409). See also Young, 404 F.3d at 28-31
(finding failure to train officers on friendly fire situations
amounted to deliberate indifference without evidence of prior
incidents, since Department's "always armed, and always on duty,"
policy would likely lead to friendly fire shootings with high
risk of misidentification and wrongful death).

    Plaintiff in this case has not presented any evidence of a
pattern of constitutional violations resulting from the Town of
Whitman's failure to train police officers in the proper use of a
motor vehicle to pursue fleeing suspects. Nonetheless, he asserts
that failure to train Officer Leavitt on the proper use of police
motor vehicles constituted deliberate indifference to citizens'
constitutional rights in light of Officer Leavitt's prior
problematic history with motor vehicles, juveniles, and the
public. See Brown v. Bryan County, 219 F.3d 450, 463 (5th Cir.
2000) (considering police officer's prior record of recklessness
and questionable judgment as notice to supervisor that failure to
train in use of force would result in violation of citizens'
rights, even without evidence of prior constitutional
violations). In light of his history, a reasonable factfinder

could find that the Town's failure to train Leavitt with respect
to its explicit "heading off" policies would have resulted in a
violation of a citizens' rights.

Plaintiff also alleges that Town of Whitman failed to train
Officer Leavitt in the proper interaction and restraint with
suspects, proper interaction and treatment of individuals under
arrest and in custody, and proper protocol concerning the
evaluation of detainee's medical needs. However, evidence on the
record suggests that Plaintiff received intermittent trainings on
these topics throughout his tenure at the Department, and there
is no evidence presented to indicate that the trainings
themselves were deficient. Additionally, unlike Leavitt's history
with motor vehicles, there are fewer indications in Leavitt's
past that without additional training on these matters Leavitt
would act in violation of the constitution.

Summary judgment on Town of Whitman's liability based on
failure to train (count 13) is **DENIED.**

### 3. Defendant Edward Slocum, Chief of Police

Plaintiff has also brought a claim of supervisory liability
against the interim Chief of Police at the time of the incident,
Edward Slocum. Like municipal liability, supervisory liability
under § 1983 cannot be predicated on a *respondeat superior*
theory. Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st
Cir. 1999). Rather, any liability incurred by a supervisor must

33

be "on the basis of his own acts or omissions." <u>Maldonado-Denis</u>
<u>v. Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir. 1994). Thus,
supervisory liability for alleged constitutional deprivations
attaches "if a responsible official supervises, trains, or hires
a subordinate with deliberate indifference toward the possibility
that deficient performance of the task eventually may contribute
to a civil rights deprivation." <u>Sanchez v. Pereira-Castillo</u>, 590
F.3d 31, 49 (1st Cir. 2009) (internal quotations omitted).

Although Chief Slocum had some knowledge of Leavitt's prior
history, his actions do not rise to the level of deliberate
indifference. Slocum had less notice of Officer Leavitt's prior
problematic history operating vehicles. Slocum only served as
interim police chief from the summer of 2006 until September of
2007. Thus, Slocum was not Leavitt's supervisor the two times he
was restricted to desk duty. He was aware of Leavitt's four year
restriction to desk duty, and he also knew about the severe motor
vehicle accident in which Leavitt was involved. However, Slocum
stated at deposition that he was not aware of the circumstances
surrounding the driving restriction, nor did he know that Leavitt
was undergoing psychological treatment due to the motor vehicle
accident.

Plaintiff strongly urges that Slocum should have reviewed
Leavitt's personnel file in greater detail. Had he done so,
Plaintiff argues, Slocum would have realized that Leavitt

34

required additional motor vehicle and other training. However, Plaintiff has not shown any independent reason for Slocum to review Leavitt's personnel file prior to the incident at issue. See Poe v. Leonard, 282 F.3d 123, 142 (2d Cir. 2002) ("[A] supervisor is not liable for failing to review an inherited subordinate's personnel history upon assuming command, absent some independent reason for him to do so.").  Without this detailed knowledge of Leavitt's history and without general patterns of constitutional violations, Slocum had no notice of the potential for violation and, so, did not demonstrate deliberate indifference in failing to provide Leavitt with additional supervision or training. Summary judgment on the vicarious liability counts against Chief Slocum (counts 11 & 12) is **ALLOWED**.

**C. State Law Claims**

**1. Lack of Probable Cause, False Arrest and Imprisonment Against Officer Leavitt**

Plaintiff claims false arrest and imprisonment, contending that Defendant Leavitt lacked probable cause to arrest him. A false arrest accompanied by an intentional confinement may be the basis for an action of false imprisonment.  Wax v. McGrath, 255 Mass. 340, 342 (1926). False arrest occurs when "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not

consent to the confinement; and (4) the defendant had no privilege to cause the confinement." <u>Brisson v. City of New Bedford</u>, No. 03-12249-DPW, 2005 WL 2862227, at *7 (D. Mass. Oct. 31, 2005). "A peace officer, in the absence of statute . . . may arrest without a warrant for a misdemeanor which (1) involves a breach of the peace, (2) is committed in the presence or view of the officer . . . and (3) is still continuing at the time of the arrest or only interrupted, so that the offence and the arrest form parts of one transaction." <u>Commonwealth v. Howe</u>, 405 Mass. 332, 334 (1989). <u>See also</u> Mass. Gen. Laws ch. 231, § 94A.

As discussed above, Officer Leavitt had sufficient probable cause to arrest and detain Plaintiff under the Fourth Amendment. However, the key inquiry under state law is whether Officer Leavitt had sufficient probable cause to believe that McCormack was committing these misdemeanors in his presence at the time of arrest. <u>Santiago v. Fenton</u>, 891 F.2d 373, 385 n.7 (1st Cir. 1989) ("§ 94A grants immunity only where the officer has probable cause to believe that an offense for which he may make an arrest *is being committed in his presence.*"). As, neither party has discussed this distinction in the state law false arrest and imprisonment claims, the Court **DENIES** summary judgment on the claim of lack of probable cause to arrest (count 8) and false arrest and imprisonment (count 9).

**2. Intentional Infliction of Emotional Distress Against Officer Leavitt**

"To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." Roman v. Trs. of Tufts College, 461 Mass. 707, 717-18 (2012). Conduct is extreme and outrageous "'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. at 718 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)) (internal citations omitted).

Plaintiff alleges distress, such as chest pains and anxiety that resulted in hospitalization, due to the trauma of this incident. Plaintiff also states that after he was apprehended and handcuffed, Officer Leavitt pulled on Plaintiffs earrings until they bled, taunted Plaintiff with racially charged language, and withheld medical treatment despite knowledge of Plaintiff's injuries. Although these facts are hotly disputed and must be resolved, a jury could find such conduct was intentional and outrageous. Summary judgment on this count (6) is **DENIED.**

**3. Excessive Force Claim Against Officer Leavitt**

Plaintiff also brings a claim of excessive force under Mass. Gen. Laws ch. 12 § 11H and 11I. Claims arising under the sections 11H and 11I of the MCRA have been considered coextensive with corresponding federal claims under §1983 in the excessive force context. Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23 (1985). Under the above analysis, summary judgment on the state law excessive force claim (count 8) is **DENIED**.

## IV. ORDER

After a review of the record and hearing, the Court **ALLOWS IN PART and DENIES IN PART** Defendant Dean Leavitt's Motion for Summary Judgment (Docket No. 52) as follows:

- Count I:      Summary judgment **DENIED**.

- Count II:     Summary judgment **DENIED**.

- Count III:    Summary judgment **DENIED** with respect to Excessive Force Claim, **ALLOWED** with respect to False Arrest Claim.

- Count IV:     Summary judgment **ALLOWED**.

- Count VI:     Summary judgment **DENIED**.

- Count VIII:   Summary judgment **DENIED**.

- Count IX:     Summary judgment **DENIED**.

The Court **ALLOWS IN PART and DENIES IN PART** Defendant Town of Whitman's Motion for Partial Summary Judgment and **ALLOWS**

Defendant Slocum's Motion in its entirety (Docket No. 55) as

follows:

- Count XI:    Summary judgment **ALLOWED**.

- Count XII:   Summary judgment **ALLOWED**.

- Count XIII:  Summary judgment **DENIED**.

                          /s/ PATTI B. SARIS
                          Patti B. Saris
                          Chief United States District Judge